**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dale Alan JOHNSON, Defendant–
Appellant.**

No. 03–30101.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed Feb. 5, 2004.

Daniel R. Wilson, Measure & Wilson, P.C., Kalispell, MT, for the defendant-appellant.

Carl E. Rostad, Assistant United States Attorney, Great Falls, MT, and Joshua S. Van de Wetering, Assistant United States Attorney, Missoula, MT, for the plaintiff-appellee.

Before BRUNETTI, T.G. NELSON, and GRABER, Circuit Judges.

## OPINION

T.G. NELSON, Circuit Judge:

On October 26, 2002, Appellant Dale Alan Johnson ("Johnson") was convicted by a jury of possession with intent to distribute methamphetamine. During trial, Johnson moved for acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motion. At sentencing, Johnson objected to the pre-sentence investigator's base offense level calculation on the ground that it included approximately 80.9 grams of methamphetamine that Johnson never actually possessed. The district court disagreed with Johnson's objection and adopted the pre-sentence investigator's recommendation. Johnson now appeals. We have jurisdiction pursuant to 18 U.S.C. § 3231. We affirm.

## I. BACKGROUND

On October 25, 2001, a detective with the San Bernardino, California, Sheriff's Office was performing random checks at a FedEx facility in San Bernardino. Employing certain criteria, he looked for packages which might contain illegal drugs. A package addressed to Johnson in Butte, Montana, met some of the criteria. It was placed on the floor, along with other packages, for examination by a drug-detection dog. The dog alerted on Johnson's package, so the detective obtained a search warrant and opened the package. Inside he found a stuffed animal with stitching on the back that appeared different from the stitching on the remainder of the toy. The detective opened the back seam and inside found a baggie which contained approximately 83.2 grams of what appeared to be methamphetamine. The detective then contacted Agent Blair Martenson of the Southwest Montana Drug Force, who directed the detective to place the entire package and its contents in a large box and send it to him.

Upon receipt, Agent Martenson removed 80.9 grams of methamphetamine from the stuffed animal and placed it into a separate bag for testing and preservation of evidence. He then placed a combination of approximately 2.3 grams [1] of methamphetamine and enough vitamin B–

---

1. The forensic chemist who tested the methamphetamine found that the sample recovered from Johnson's home was 2.3 grams and was 20% pure. Agent Martenson testified that he placed approximately 10 grams back into the package for the controlled delivery and that the amount recovered at Johnson's house appeared to be "somewhat smaller than the amount that I put in." There is no

powder to roughly approximate the amount of the removed methamphetamine back into the stuffed animal.[2] Agent Martenson then repackaged the box addressed to Johnson.

While the agents had possession of the package, a FedEx employee informed them that she had received an inquiry on her computer via FedEx's national tracing system regarding the whereabouts of the package. The message indicated that Johnson had called the company's toll-free number and complained that he had not yet received the package and that it was a birthday present. The confiscated package had the words "Happy B Day" written on the outside.

The following day, on October 26, 2001, an agent dressed in a FedEx uniform delivered the package to Johnson's home. Johnson signed the form presented by the agent, accepted the package, and took it with him back inside the house. Approximately eleven minutes after the package was delivered, the agents attempted to serve a search warrant and seize the package and its contents. Johnson did not immediately answer the door, and the agents unsuccessfully attempted to break it down. Johnson thereafter opened the door.[3]

After placing Johnson, his girlfriend, and his brother under arrest, the agents searched the home and found a small, electronic scale of the type often used to weigh drug product for sale. Agents further found small vials with drug residue; a number of small, self-sealing baggies; a

lighter and propane torch; and a "pay-and-owe" sheet that listed the amount individuals owed, the value of the quantities of drugs, and identified customers by their initials or towns. The agents located the package they had delivered and also found the stuffed animal placed on top of what was later identified as Johnson's dresser. The methamphetamine and vitamin B–12 were on a piece of glass under Johnson's dresser. The methamphetamine had been separated from the vitamin B–12, and on top of the dresser was a small piece of folded aluminum foil, upon which was a small amount of methamphetamine. Next to the foil was a small plastic tube.

On February 22, 2002, Johnson was charged by a federal grand jury with two offenses. Count I charged him with conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846, and Count II charged him with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1).[4]

On the morning of trial, Count I was dismissed upon the Government's motion, and trial proceeded on Count II. Following the conclusion of the Government's case, Johnson moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The court took the motion under advisement. Johnson then presented his defense and thereafter renewed his motion under Rule 29. The court again took the matter under advisement.

The following day, the jury returned a guilty verdict. After reading the verdict,

explanation in the record for the discrepancy in amounts.

2. Agent Martenson stated that he removed the 80.9 grams because, in his experience, when law enforcement attempts to serve a search warrant, the suspect often attempts to destroy the evidence.

3. It is undisputed that at the time agents entered the home, Johnson's then-girlfriend,

now his wife, Tina Smith, and his brother Arlen were both in the residence.

4. Tina Smith and Arlen Johnson were originally charged with conspiracy to possess with intent to distribute methamphetamine, but those charges were later dismissed by the Government.

the court orally denied Johnson's Rule 29 motions and set sentencing for February 5, 2003. On December 20, 2002, the district court denied Johnson's motion for judgment of acquittal by written order.

In his sentencing memorandum of January 27, 2003, Johnson objected to the presentence investigator's calculation of his base offense level. The investigator had assigned Johnson responsibility for the full 83.2 grams of methamphetamine for purposes of the calculation. During the sentencing hearing, Johnson renewed his objection to the calculation, which the court overruled, and thereafter sentenced him to seventy-six months of incarceration followed by three years of supervised release.

Johnson appeals the district court's denial of his motion for judgment of acquittal and the base offense level calculation.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE TO SUPPORT DISTRICT COURT'S DENIAL OF JOHNSON'S MOTION FOR JUDGMENT OF ACQUITTAL

 A trial court's denial of a motion for acquittal under Federal Rule of Criminal Procedure 29 is reviewed *de novo*.[5] The court must examine the ruling in the light most favorable to the Government and ask whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "[6]

 Johnson appeals the district court's denial of his motion for judgment of acquittal on the basis of insufficient evidence.

Specifically, Johnson contends that he had to have the intent to distribute the methamphetamine at the same time as he possessed the drug. He states that he only actually possessed 2.3 grams, that it was only 20% pure, and that he never had the intent to distribute that amount. He stated during trial that he intended only to consume, not to distribute, the quantity of methamphetamine he actually received. He points to the fact that he had a quantity of methamphetamine on a piece of foil and was preparing to smoke it when the agents arrested him. He also points to the fact that he is an acknowledged methamphetamine addict who could and would consume that quantity of methamphetamine in one day.

The Government, on the other hand, argues that at the moment he accepted the package Johnson knew that it contained methamphetamine, and he accepted the package with the intent to distribute what he intended to receive. The Government further contends that Johnson constructively possessed the entire 80.9 grams of methamphetamine because it was in the FedEx system, addressed to him, and he had called and inquired about the package's whereabouts. The Government argues that the quantity of methamphetamine in the package sent indicates Johnson intended to distribute the drug.

#### 1. *Possession of Methamphetamine.*

The elements of possession with intent to distribute are: (1) knowingly possessing a controlled substance, (2) with intent to deliver it to another person.[7] We will consider each of these elements in turn.

**5.** *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir.), *cert. denied*, 537 U.S. 1037, 123 S.Ct. 572, 154 L.Ed.2d 458 (2002).

**6.** *Id.* at 641–42 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

**7.** *United States v. Diaz–Cardenas*, 351 F.3d 404, 407 (9th Cir.2003).

The record below supports a holding that Johnson knowingly possessed methamphetamine. When he received the package by controlled delivery, he had the package for approximately eleven minutes before the authorities arrived. In that time, he opened the package, took out the stuffed animal and removed the plastic baggie with the substances in it. He then poured the contents onto a piece of glass, separated the methamphetamine from the vitamin B–12, and placed some of the methamphetamine on a piece of aluminum foil. He was preparing to smoke some of the drug when agents arrived. Johnson acknowledges that he is a methamphetamine addict, that he recognizes methamphetamine by smell and identified some of the substance found in the baggie as methamphetamine. Thus, we find sufficient evidence in the record that Johnson knowingly possessed methamphetamine.

### 2. *Intent to Distribute.*

■ Setting aside the issue of the quantity of methamphetamine possessed, the record contains sufficient evidence of Johnson's intent to distribute. Agents found small, self-sealing bags of the type in which distributors tend to package drugs; a type of scale commonly used to weigh drugs for sale; and a "pay-and-owe" sheet, where quantities of drugs, dollar amounts and customers are listed. While these items individually are not necessarily indicative of drug distribution activity, col-

lectively they support such a conclusion. Thus, there is sufficient evidence of Johnson's intent to distribute in the record to support the jury's verdict.

Johnson urges us to follow *United States v. Gomez–Tostado*[8] for the proposition that the intent to distribute must occur at the same time as possession.[9] The proposition is applicable here and brings the quantity of methamphetamine possessed into play, because Johnson argues that when he saw the amount of methamphetamine in the package, he intended only to consume it. A jury can infer intent to distribute from possession of a large quantity of drugs.[10] The agents testified that the total amount of methamphetamine, 83.2 grams, is inconsistent with personal use.[11]

A rational jury could find that Johnson knew a package containing methamphetamine had been sent to him via FedEx. He had a FedEx tracking number, and while inquiring about its projected delivery date, Johnson even described the package as a "birthday present." The package had "Happy B Day" written on the outside. Additionally, the evidence showed that Johnson had wired at least $1,600 to Jody Bly, a woman from whom he had purchased drugs in the past, and who lived in California, the package's state of origin. Additionally, the evidence at trial also showed that the price of methamphetamine in California was $800 per ounce.[12] Thus, we hold that a reasonable jury could

---

8. 597 F.2d 170 (9th Cir.1979).

9. The defendant in *Gomez–Tostado* argued that he formed the intent while in Mexico to distribute the heroin he possessed. The court stated that, "the location where the defendant first forms his intent does not matter, so long as the intent coincides at some point with possession in the United States." *597 F.2d* at 173.

10. *United States v. Cervantes*, 219 F.3d 882, 893 (9th Cir.2000).

11. Specifically, Agent Martenson stated that users typically have between 1 gram and 3.5 grams on their person. Dealers, on the other hand, could be in possession of only 1 gram but usually possess 3.5 grams or more.

12. Agent Martenson testified that while interviewing Johnson subsequent to his arrest, he asked Johnson if the price of an ounce of methamphetamine in California was $1,000. He stated that Johnson said, "No, it would be closer to $800."

find that at the moment when the controlled delivery was made, until Johnson realized he only had enough for his own use, his possession of methamphetamine coincided with his intent to distribute, as evidenced by the distribution paraphernalia around the house. The fact that his intent to distribute lasted only a few minutes is insignificant. It provides a proper basis for the jury's conclusion.

Accordingly, viewing the evidence in the light most favorable to the Government, we hold that a rational trier of fact could find that Johnson possessed methamphetamine with an intent to distribute it. We affirm the district court's denial of Johnson's motion for judgment of acquittal.

### 3. Constructive Possession.

The Government argues that Johnson constructively possessed all 83.2 grams of methamphetamine. It is unnecessary for us to resolve this argument on appeal. The record contains sufficient evidence to support a finding that Johnson knowingly possessed methamphetamine and intended to distribute it.

### B. SENTENCING

The presentence investigator calculated the base offense level using U.S.S.G. § 2D1.1(a)(3).[13] Under that section, the offense level is determined by the quantity of drugs involved in the offense. In making the calculation, the presentence investigator included the approximately 83.2 grams of methamphetamine originally in the package rather than just the 2.3 grams actually delivered to Johnson. Johnson objected to this inclusion both in writing and at his sentencing. Thus, the issue before us is whether the methamphetamine removed from the package prior to the controlled delivery is "relevant conduct" for

purposes of establishing a base offense level for sentencing. We hold that Johnson is accountable for all the methamphetamine originally placed in the package and shipped to him, even though he never received most of it.

■ Johnson's base offense level was calculated using U.S.S.G. § 2D1.1(a)(3), which provides that the base offense level will be "the offense level specified in the Drug Quantity Table." Section 1B1.3(a)(1)(A) provides that where the guideline specifies more than one base offense level (as it does in § 2D1.1(a)), the base offense level shall be determined on the basis of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that occurred "during the commission of the offense of conviction." This section is often referred to as the "relevant conduct" provision. Application Note 2 to that provision states:

> With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved. . . . [14]

Thus, the question is whether Johnson was "directly involved" with the entire quantity of methamphetamine shipped to him, or only the 2.3 grams he received.

This appears to be a question of first impression in this circuit. However, both the Seventh and Eighth Circuits have considered the issue and held that narcotics removed from a package prior to a controlled delivery being made are relevant conduct for the purposes of sentencing. In *United States v. White*, customs officials intercepted two packages addressed to White, each package containing cocaine base.[15] Federal drug agents removed all

---

**13.** U.S. Sentencing Guidelines Manual § 2D1.1(a)(3) (2000).

**14.** *Id.* § 1B1.3, cmt. n. 2.

**15.** 888 F.2d 490 (7th Cir.1989).

but 2 grams of the cocaine base and replaced it with sugar. One package was then placed in White's post office box, and officers watched the box until White came and picked up the package. White was convicted of possession with intent to manufacture and distribute. The trial judge sentenced White based upon a finding that White had possessed only 1.88 grams of cocaine with intent to manufacture and distribute. The 1.88 grams represented the amount delivered to White's post office box and actually possessed by him.

On appeal, the Seventh Circuit interpreted U.S.S.G. § 1B1.3(a)(2) and held that White "embarked on a single 'course of conduct': ordering and receiving a shipment of cocaine base. The amount in the packages when they entered the country is the total that must go into the base offense level under § 1B1.3(a)(2)." [16]

Likewise, in *United States v. Franklin*, a postal inspector intercepted a parcel addressed to Franklin's address and found four kilos of cocaine inside.[17] The inspectors removed all but one ounce of the cocaine and delivered it to Franklin's door. He was convicted of possession of cocaine with intent to distribute and sentenced based upon all four kilos of cocaine, rather than the one ounce delivered to him.[18] On appeal, Franklin contended that he ought to have been sentenced only on the one ounce actually delivered to him. The Eighth Circuit disagreed, citing *White*, and stated that the district court "acted correctly in basing the sentence on the amount of cocaine originally in the package." [19] The *Franklin* court quoted from *White* and employed the same reasoning:

"A case such as this illustrates a function of § 1B1.3(a)(2). It would perpetuate irrational distinctions in sentencing to make the difference between 33 months (the maximum sentence for [the 1.88 grams of cocaine delivered to White]) and 151 months (the minimum sentence for [the 302 grams originally sent to White]) depend on the DEA's decision to drain most of the cocaine from the packages bound for White. If the DEA had added an extra 200 grams to the original 302, this would not bump White's offense up in seriousness; why should the decision to remove cocaine reduce it? If investigatory agencies can secure higher sentences by allowing drugs to be delivered despite detection, they will be tempted to do this, creating a risk that larger flows will reach consumers if the 'controlled delivery' becomes uncontrolled and the drugs disappear.

"White embarked on a single 'course of conduct': ordering and receiving a shipment of cocaine base. The amount in the packages when they entered the country is the total that must go into the base offense level under § 1B1.3(a)(2). Although the district judge emphasized that White's crime was possessing 1.88 grams, the *seriousness* of this particular crime, and therefore the appropriate sentence, depends on the original quantity. To base the sentence on the larger amount is not to punish White for a crime he didn't commit; it is to use consistent criteria to choose the sentence for the crime he did commit." [20]

We find the reasoning employed by *White* and *Franklin* persuasive here.[21] To hold

---

16. *Id.* at 498.

17. 926 F.2d 734, 735 (8th Cir.1991).

18. *Id.* at 736.

19. *Id.* at 737.

20. *Id.* (quoting *White*, 888 F.2d at 498).

21. Both *Franklin* and *White* relied on U.S.S.G. § 1B1.3(a)(2). Neither the presentence report nor the transcript of the sentencing hearing in the instant case refers to § 1B1.3(a)(2). However, a review of that section shows that it is applicable here. U.S.S.G. § 1B1.3(a)(2) provides that relevant conduct, for the purpose of establishing a

otherwise would result in inconsistent sentences and difficult choices for law enforcement when considering whether to remove the larger portion of narcotics prior to attempting a controlled delivery.

Accordingly, Johnson is accountable for all 83.2 grams of methamphetamine. They were sent to him in one shipment. The fact that he received only 2.3 grams was fortuitous. Had the package been undetected by drug agents, Johnson would have received the full amount of methamphetamine. He intended and attempted to acquire it all. Additionally, had the agents successfully made a controlled delivery of the original package rather than removing most of the drugs, 83.2 grams would have arrived at Johnson's door. His relevant conduct was ordering a controlled substance, checking on the package, and receiving it when it was delivered. The agents' conduct did not alter Johnson's conduct for purposes of calculating a base offense level.

Based upon the foregoing, although Johnson physically possessed only a small amount of the methamphetamine originally shipped to him, this does not prevent the inclusion of the remainder in his base offense level calculation. We hold that the district court did not abuse its discretion in including the intercepted methamphetamine in Johnson's base offense level calculations as part of his relevant conduct.[22]

AFFIRMED.

base offense level includes: "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts," all acts and omissions that "were part of the same course of conduct or common scheme or plan as the offense of conviction." Section 3D1.2(d) provides:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: ... (d) When the offense level is determined largely on the basis of the ... quantity of [the] substance involved....

Application Note 3 to U.S.S.G. 1B1.3 states that application of this provision "does not require the defendant, in fact, to have been convicted of multiple counts." U.S.S.G. 1B1.3, cmt. n. 3.

In the instant case, the offense level is driven by the quantity of the substance involved. Furthermore, § 3D1.2(d) specifically states that offenses falling within § 2D1.1, the guideline referring to the base offense level calculation for the crime of unlawful possession of drugs, are to be grouped. Accordingly, § 1B1.3(a)(2) is applicable, and acts that were part of the same course of conduct as the offense of conviction are part of Johnson's relevant conduct for purposes of computing his base offense level. This parallel provides a sound basis for our reliance on *White* and *Franklin*.

22. We note that the issue of constructive possession, mentioned briefly above, is not one that will alter Johnson's sentence. For sentencing purposes, it is immaterial whether he constructively possessed all 83.2 grams or possessed only 2.3 grams. The sentence is driven by the base offense level, which is calculated by adding the quantity of methamphetamine Johnson possessed, along with any quantities attributable to him due to his relevant conduct. Thus, Johnson's base offense level would be 26 under either scenario. *See* U.S.S.G. § 2D1.1(c) (base offense level is 26 where at least 50G but less than 200G of methamphetamine is involved). Thus, we need not resolve the question whether Johnson constructively possessed the whole amount.