**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

MARION HUNGERFORD,
            *Defendant-Appellant.*

No. 05-30500

D.C. No.
CR-03-00074-RFC

OPINION

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, District Judge, Presiding

Argued and Submitted
July 25, 2006—Portland, Oregon

Filed October 13, 2006

Before: Stephen Reinhardt and Susan P. Graber,
Circuit Judges, and Ronald S.W. Lew,* District Judge.

Opinion by Judge Graber;
Concurrence by Judge Reinhardt

*The Honorable Ronald S.W. Lew, District Judge for the United States District Court for the Central District of California, sitting by designation.

17559

**COUNSEL**

Palmer Hoovestal, Hoovestal Law Firm, PLLC, Helena, Montana, for the defendant-appellant.

James E. Seykora, Assistant United States Attorney, Billings, Montana; and Anna S. Peckham, Assistant United States Attorney, Great Falls, Montana, for the plaintiff-appellee.

**OPINION**

GRABER, Circuit Judge:

After a jury trial, Defendant Marion Hungerford was convicted of conspiracy, seven counts of robbery, and seven counts of using a firearm in relation to a crime of violence, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 1952, and 18 U.S.C. § 924(c)(1) and (c)(2). She appeals her conviction of four of the counts of robbery and the four related counts of using a firearm. She also appeals her sentence; she received 57 months of imprisonment for the conspiracy and robbery counts, to run concurrently, plus 60 months for the first firearm charge and 300 months for each of the other firearm charges, to run consecutively. We affirm.

FACTUAL AND PROCEDURAL HISTORY

Defendant met Dana Canfield in September 2001. In 2002, Canfield moved into her home. Neither was employed at the time. In order to get money to pay rent, Canfield and Defen-

dant decided to rob a convenience store. At trial, Canfield testified, "Marion said that she was going to have to go on a crime spree. And since she has problems walking and stuff, I decided that I would do it." The pair drove around together looking at potential places to rob. They decided on a convenience store called 3-G's. In March 2002, Defendant dropped him off at the 3-G's and drove to a nearby laundromat. Canfield robbed the store at gunpoint, rendezvoused with Defendant at the laundromat, and gave her the money. The jury found Defendant not guilty of the 3-G's robbery.

The 3-G's robbery was the first in a series of Montana armed robberies carried out by Canfield at Defendant's instigation, the proceeds of which she received and spent. Next, Canfield testified to robbing a store called Bottles & Shots on April 6, 2002. He drove himself to the location while Defendant again waited for him at a laundromat. Again, he used a gun and delivered the proceeds of the robbery to Defendant. The jury found Defendant not guilty of the Bottles & Shots robbery.

Canfield testified that, after he told Defendant about the adrenaline rush that accompanied the robberies, "she wanted to be more involved in the crimes, so she wanted to be—she wanted to help participate." On May 6, 2002, Canfield robbed the Jackpot Casino, using a firearm. Defendant went into the casino ahead of Canfield and called to tell him how many people were inside and how many tills were operating. The jury found Defendant guilty of the Jackpot Casino robbery, a conviction that she does not challenge on appeal.

Canfield described similar involvement by Defendant in both the Alpine Casino and Cenex AmPride robberies. The two drove together to the Alpine Casino; Defendant entered, counted the number of employees who were working there, and returned to the car to report the information to Canfield. He then went inside, robbed the casino at gunpoint, returned to the car where Defendant was waiting, and gave her the

money. Similarly, at the Cenex AmPride convenience store, Defendant went into the store first and signaled to Canfield that it was safe to proceed with the robbery. The jury convicted Defendant of both of those robberies, and she does not challenge those convictions here.

After the Cenex AmPride robbery, Detective Ewalt telephoned Defendant to ask questions about the Jackpot Casino robbery. Defendant and Canfield discussed the false statement that Defendant planned to give to the detective to impede his investigation. Further, they agreed that Defendant should establish an alibi during the next robbery. At the Jackpot Casino and Cenex AmPride robberies, she had been seen by employees when she entered the establishments just before the robber came in. Consequently, Defendant planned to remain at the home of the couple's landlord while Canfield committed the next robbery.

According to Canfield, Defendant did not help him "case out" the next location; she left "most . . . everything" up to him about where to go and what to do. Canfield robbed Magoo's at gunpoint on June 13, 2002. When he returned home afterward, Defendant was there and he gave her the money that he had stolen.

Canfield committed an armed robbery at the Second Shift Bar on June 25, 2002. Defendant did not help him case that establishment beforehand, nor did he tell her what business he planned to rob. Afterward, though, he gave all the proceeds to Defendant.

Canfield robbed the Winners Circle on July 2, 2002, using a firearm. Again, Defendant did not scout the location, and she stayed home during the robbery. She knew that Canfield was going to commit another robbery but did not know specifically where. Canfield gave the proceeds of this robbery, too, to Defendant.

Although her direct participation in these later robberies was minimal, Defendant did not ask Canfield to stop committing armed robberies. She accepted the proceeds, knowing their source, and the proceeds from these periodic crimes provided the only means the couple had to meet their financial needs.

After they had a chance meeting with Detective Ewalt, Defendant and Canfield decided that they ought to end the string of armed robberies. They mapped out a strategy to "leave a trail out of town" and then stop. The plan was to rob an establishment in Butte, Montana, then go to Missoula and rob another place there "using the same mask and MO" as had been used in the earlier robberies. They traveled to Butte, rented a hotel room, and together they scouted possible targets. They selected an establishment called Gramma's. When Canfield went there on July 27, 2002, he decided against robbing it and instead chose to rob Joker's Wild. Defendant remained in the hotel during this armed robbery. Afterward, Canfield gave Defendant the proceeds, and both of them together destroyed the checks, which they had obtained along with the cash. The police arrested Canfield that night at the hotel; Defendant was arrested later. Before being arrested, Defendant contacted an acquaintance and coaxed her to make a false statement to the Butte police concerning the identity of the Joker's Wild robber, to throw them off track.

## STANDARDS OF REVIEW

We review de novo a district court's denial of a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. *United States v. Johnson*, 357 F.3d 980, 983 (9th Cir. 2004). We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

We review de novo whether a statute is void for vagueness. *United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir.), *cert.*

*denied*, 543 U.S. 867 (2004). Similarly, we review de novo the constitutionality of a criminal sentence. *United States v. Barajas-Avalos*, 377 F.3d 1040, 1060 (9th Cir. 2004), *cert. denied*, 543 U.S. 1188 (2005).

## DISCUSSION

A. *Sufficient evidence supports the convictions of robbery and using a firearm.*

Defendant argues, first, that there was insufficient evidence to support her convictions stemming from the armed robberies of Magoo's, Second Shift, Winner's Circle, and Joker's Wild and thus that the district court erred when it denied her Rule 29 motion. We are not persuaded.

**[1]** The jury convicted Defendant of the conspiracy charge, a conviction that she does not challenge on appeal. In *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946), the Supreme Court addressed a factual situation similar to the one at hand. In that case, the defendant brothers, Daniel and Walter, were convicted of conspiring to violate the Internal Revenue Code and also of substantive violations of the Code. There was no evidence that Daniel had participated directly in the commission of the substantive offenses, yet the Court upheld his convictions on those charges as well as on the conspiracy count. The Court did so because there was a "continuous conspiracy" and "no evidence of the affirmative action on the part of Daniel which is necessary to establish his withdrawal from it." *Id.* at 646. "And so long as the partnership in crime continues, the partners act for each other in carrying it forward." *Id.*

**[2]** As noted, Defendant does not challenge the sufficiency of the evidence underlying her conspiracy conviction. She conspired with Canfield to commit the whole series of armed robberies, in a continuous sequence. There is no evidence that Defendant took any affirmative act to withdraw from the

ongoing conspiracy before the four robberies in question occurred. To the contrary, she continued to accept and spend the proceeds of all the robberies and worked purposefully to conceal the crimes. She helped actively to plan the Missoula robbery. Accordingly, there is sufficient evidence to support the challenged convictions under the conspiracy liability doctrine of *Pinkerton*.

**[3]** Alternatively, and additionally, the record contains sufficient evidence to support Defendant's convictions under an aiding and abetting theory of liability in violation of 18 U.S.C. § 2(a). To aid and abet another to commit a crime, it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (internal quotation marks omitted). Defendant helped to plan the robberies, she scouted potential targets, she had knowledge that her co-conspirator was carrying out the robberies, and she willingly accepted the proceeds of each of the crimes. For this reason, too, sufficient evidence supports the disputed convictions.

B. *Title 18 U.S.C. § 924(c)(1) is not unconstitutionally vague.*

The jury convicted Defendant of seven counts of knowingly using or carrying a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1) and (c)(2). The statute states, in pertinent part:

> [A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . .
> —

(i) be sentenced to a term of imprisonment of not less than 5 years[.]

*Id.* § 924(c)(1)(A)(i).

In the case of a second or subsequent conviction under this subsection, the person shall—

(i) be sentenced to a term of imprisonment of not less than 25 years[.]

*Id.* § 924(c)(1)(C)(i).

Notwithstanding any other provision of law—

. . .

(ii) no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

*Id.* § 924(c)(1)(D)(ii). Pursuant to the statute, the district court sentenced Defendant to five years for her first firearm conviction and 25 years for each of the other six firearm convictions, to run consecutively.

Defendant urges us to find that the statute is unconstitutionally vague. She argues that, because the statute specifies that 25-year terms are to be imposed for "second or subsequent" convictions but not for "each" subsequent conviction, she could not have known that she would be sentenced to multiple 25-year minimum sentences.

[4] A statute is void for vagueness when it fails to give "adequate notice to people of ordinary intelligence of what *con-*

*duct* is prohibited, or if it invites arbitrary and discriminatory enforcement." *United States v. Tabacca*, 924 F.2d 906, 912 (9th Cir. 1991) (emphasis added). Defendant does not argue that she was unaware that the use of a firearm in relation to robbery is prohibited by § 924. Rather, she claims only that the statute failed to warn her of the potentially draconian penalty for committing multiple armed robberies.[1]

**[5]** Even assuming that a vagueness argument focused exclusively on sentencing, rather than on criminal conduct giving rise to the sentence, is cognizable, the statute is not vague. The Supreme Court has interpreted the meaning of § 924. *Deal v. United States*, 508 U.S. 129, 137 (1993). Its terms are readily understandable. Its mandatory nature, whatever its merits or demerits as a policy matter, invites uniform enforcement, rather than arbitrary or discriminatory enforcement. *See, e.g.*, *id.* (upholding multiple, consecutive, lengthy sentences under § 924); *United States v. Angelos*, 433 F.3d 738, 754 (10th Cir. 2006) (same), *petition for cert. filed*, 75 U.S.L.W. 3034 (U.S. July 3, 2006) (No. 06-26); *United States v. Camps*, 32 F.3d 102, 109 (4th Cir. 1994) (same). A plain reading of the statute reveals no ambiguity, as this consistent precedent recognizes.

C. *The sentence violates neither the Fifth nor the Eighth Amendment.*

**[6]** Finally, Defendant brings two constitutional claims. She argues that the mandatory minimum sentence established by § 924 violates the Fifth Amendment's guarantee of due process by removing discretion from the judiciary and placing it in the hands of the prosecutor. We already have rejected the argument that mandatory minimum sentences established by statute violate due process. *United States v. Wilkins*, 911 F.2d 337, 339 (9th Cir. 1990). The Supreme Court's decision in

---

[1]Defendant challenges only four of the § 924 counts, so she does not dispute 55 years of the mandatory sentence.

*United States v. Booker*, 543 U.S. 220 (2005), does not change that rule. *United States v. Dare*, 425 F.3d 634, 643 (9th Cir. 2005), *cert. denied*, 26 S. Ct. 2959 (2006).

[7] Finally, Defendant argues that the Eighth Amendment precludes the lengthy consecutive mandatory minimum sentences imposed here under § 924. This argument also is directly precluded by our precedent. *United States v. Parker*. 241 F.3d 1114, 1117 (9th Cir. 2001).

AFFIRMED.

---

REINHARDT, Circuit Judge, concurring in the judgment:

Although precedent forecloses Marion Hungerford's Eighth Amendment challenge to 18 U.S.C. § 924(c) (2006),[1] under which she received almost all of her 159-year term of imprisonment, it cannot be left unsaid how irrational, inhumane, and absurd the sentence in this case is, and moreover, how this particular sentence is a predictable by-product of the cruel and unjust mandatory minimum sentencing scheme adopted by Congress. This court, along with many individuals, has previously urged Congress to "reconsider its harsh scheme of mandatory minimum sentences without the possibility of parole;"[2] now, Hungerford's case serves as yet another forceful reminder that the scheme is severely broken and badly in need of repair. Although we lack the authority either to reform these statutes or to reconsider the Eighth Amendment principles adopted by the Supreme Court, those who have both the power and the responsibility to do so should return our federal sentencing scheme to a day in which the controlling principles

---

[1]*See United States v. Parker*, 241 F.3d 1114, 1117 (9th Cir. 2001); *United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

[2]*Harris*, 154 F.3d at 1085.

are fairness, proportionality, prudence and informed discretion.

When we urged Congress to reform § 924 and other unnecessarily harsh mandatory sentencing laws,[3] each additional conviction for use of a firearm in connection with a crime of violence under § 924(c) provided for a 20-year mandatory consecutive sentence. Months later, Congress amended § 924(c)(1) to mandate 25-year mandatory consecutive sentences for such offenses. An Act to Throttle Criminal Use of Guns, Pub. L. No. 105-386, § 1(a), 112 Stat. 3469 (1998). As a result, § 924(c) now requires a 5-year sentence for a single conviction of use of a firearm and mandatory consecutive sentences of 25 years for each additional count. 18 U.S.C. § 924(c)(1).

Although she never touched a gun, Hungerford, was convicted of one count of conspiracy, seven counts of robbery, and seven counts of use of a firearm in relation to a crime of violence. The district judge sentenced her to 5 years on the first count of use of a firearm and 25 years consecutively on each of six additional counts. In addition, the district judge sentenced her to serve 57 months for the conspiracy and 57 months for the robbery convictions, the sentences to run concurrently with each other. Because § 924(c) gives the sentencing judge no choice or discretion, except to impose the statutory mandatory sentences, the judge was forced to sentence Hungerford, a 52 year-old mentally disturbed woman with no prior criminal record, to over 159 years in prison. What the judge was *not* permitted to take into account when sentencing Hungerford should shock the conscience of anyone who believes that reasonable proportionality between a crime and the sentence is a necessary condition of fair sentencing.

---

[3]*Id.*

The judge could not consider myriad potential mitigating factors, including Hungerford's severe form of Borderline Personality Disorder, which can alter one's perception of reality in a manner similar to schizophrenia and has led to numerous suicide attempts on Hungerford's part. The judge could not consider a psychiatrist's testimony regarding Hungerford's very low capacity to assess reality, her low level of intellectual functioning, and the fact that she is "very easily victimized." Especially important, the court was prohibited from taking into account the fact that Hungerford was "a follower," was "susceptib[le] to outside direction" and suffered from "suggestivity." Also out of bounds was Hungerford's vulnerable and chaotic state. Shortly before the robberies her husband of 26 years, with whom she had four children, had moved out of their home, largely as a result of her deteriorating mental condition, and, Hungerford, finding herself impecunious and without a job or any prospects for employment, had begun living with a new male companion, on whom she became dependent, Dana Canfield, the principal in the robberies. Nor could the judge consider that Hungerford, at the age of 52, was a person with no criminal history prior to the string of armed robberies committed by Canfield, and that she had apparently led a spotless, law-abiding existence. The judge could not even take into account the significant facts that no one was physically injured in any of the robberies and that the total loss resulting from them was less than $10,000.

Most important, under the law, Hungerford's extremely limited role in the crimes of which she was convicted was also irrelevant to her sentencing. Although she conspired with and aided and abetted her new-found male companion, Canfield, in a string of armed robberies, her participation in the robberies themselves was quite limited, particularly when compared to Canfield's dominant role. During most of the robberies, Hungerford took no active part other than driving Canfield to or from the scene of the crime or casing the stores that Canfield later robbed. After a police detective contacted Hungerford, she did not participate whatsoever in any of the

subsequent robberies and merely received money from Canfield following his commission of those robberies. It is worth noting that Hungerford's mental disorder likely impeded her ability to affirmatively opt out of the conspiracy after contact with the police, and even to accept the fact that she had been engaged in criminal conduct. Finally, at no time did Hungerford personally use or even carry a gun, or personally threaten anyone; yet, under § 924(c), this fact, too, is deemed irrelevant. At the time of sentencing, Hungerford's counsel presented substantial evidence of her severe mental illness. Attached to this opinion is a summary of that troubling testimony.

Under a fair and proportional sentencing scheme, a judge would not just be *allowed* to consider these compelling mitigating circumstances, but rather he would be *required* to give them substantial weight in determining the proper sentence. Even if "severe, mandatory penalties . . . are not unusual in the constitutional sense," *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991), they "may be cruel." *Id.* Although Congress may be permitted under the Constitution to adopt a cruel sentencing scheme, though not a cruel *and* unusual one, surely the people's representatives should aim above this dismally low mark. Here, it is difficult to escape the conclusion that the current mandatory sentencing laws have imposed an immensely cruel, if not barbaric, 159-year sentence on a severely mentally disturbed person who played a limited and fairly passive role in several robberies during which no one was physically harmed.[4]

---

[4]We are foreclosed from holding the sentence to be in violation of the cruel and unusual punishment clause because of its severity by *Harmelin* and *Ewing v. California*, 538 U.S. 11 (2003). *Harmelin*, 501 U.S. at 995, 1009 (rejecting a requirement that the court consider mitigation or individual circumstances, and holding that a defendant's "sentence of life imprisonment without parole" for his first felony, possession of cocaine, "does not violate the Eighth Amendment"); *Ewing*, 538 U.S. at 30-31 (holding that a defendant's "sentence of 25 years to life in prison" for a third strike consisting of the theft of three golf clubs "is not grossly disproportionate and therefore does not violate the Eighth Amendment's prohibition on cruel and unusual punishments").

Not only is the sentence cruel, it is absurd. It imposes a term of imprisonment of 159 years, under which Hungerford would be incarcerated until she reached the age of 208. The absurdity is best illustrated by the judge's reading to Hungerford the terms of supervised release which she would be required to undergo when she emerged from prison toward the end of the first decade of her third century. The judge told Hungerford that "[w]ithin 72 hours of release from custody," — in the year 2162 — she must "report in person to the probation office," and while on supervised release she must "participate in substance abuse testing to include not more than 104 urinalysis tests." He further ordered Hungerford to "participate in a program for mental health," and "pay part or all of the cost of this treatment, as determined by the U.S. probation officer." What Hungerford should do if she were too old or feeble to attend the mental health program, the judge failed to advise her. Certainly, requiring a defendant and a district judge to engage in a charade of this nature cannot increase respect for our system of justice.

The case at hand is precisely the type of case that should make Congress question what worthy ends are served by a cruel and inflexible sentencing scheme. In pondering this question, Congress would benefit by observing how Justice Kennedy, who can hardly be called soft-on-crime, let alone a liberal jurist, has come to reject mandatory minimum sentencing. Fifteen years ago, "in asserting the constitutionality of a mandatory [life] sentence," for the possession of cocaine, Justice Kennedy "offer[ed] no judgment on its wisdom." *Harmelin*, 501 U.S. at 1007 (Kennedy, J., concurring). But three years ago, he told the American Bar Association that "I can accept neither the necessity nor the wisdom of federal mandatory minimum sentences. In too many cases, mandatory minimum sentences are unwise and unjust." Anthony M. Kennedy, Associate Justice, Supreme Court of the United States, Speech at the American Bar Association Annual Meeting (Aug. 9, 2003). Among Justice Kennedy's chief concerns is that the "federal mandatory minimum statutes" transfer

"sentencing discretion from a judge to an Assistant U.S. Attorney, often not much older than the defendant." *Id.* Both this court in *Harris*,[5] and I as a member of it, agree with Justice Kennedy that this transfer of discretion is "misguided," and that "[m]ost of the sentencing discretion should be with the judge, not the prosecutors." *Id.*

Hungerford's case is a textbook example of how § 924(c) permits a prosecutor, but never a judge, to determine the appropriate sentence. Hungerford's co-conspirator, Canfield, was the principal in all of the robberies — he owned and brandished the .22 pistol in each robbery, and testified that Hungerford had nothing to do with the firearm — yet he reached an agreement with the government and received a sentence of 32 years. On the other hand, Hungerford, who refused to plead guilty, in large part due to her mental illness, was aggressively charged, convicted, and sentenced to 159 years in prison. The prosecutor used his discretion to send the mentally-ill Hungerford to prison until she turns 208, while he administered a far lesser punishment — only one-fifth as great — to the principal who put the lives of others at risk. In Hungerford's case, only the prosecutor and not the district judge had the authority to exercise discretion.

Hungerford received her 159-year sentence because she refused to enter into a plea agreement with the government. Had she been able and willing to do so, she undoubtedly would have received a significantly lesser term than the principal's 32-year sentence. Hungerford tragically refused to cooperate with the government and plead guilty, most likely because her mental illness caused her to hold a fixed belief that she was innocent. Even after the jury convicted her, Hungerford repeatedly declared her innocence at sentencing, stating that "I have not done anything illegal. I did not go

---

[5]*Harris*, 154 F.3d at 1085 ("We feel a just system of punishment demands that some level of discretion be vested in sentencing judges to consider mitigating circumstances.").

about with any gun. I don't like them. . . . I didn't take any money. . . . I honestly didn't do it . . . So please don't do whatever you're going to do to me for what you think I did, because I didn't do it." Also in light of her mental illness, Hungerford may not have even understood the nature of the offenses for which she was convicted. Yet, incredibly, the prosecutor believed that Hungerford received a fair sentence, reflecting both her criminal acts and her refusal to cooperate with the government. He told the judge that

> counsel and the defendant can blame the prosecution, blame the Court, can blame the Congress. The jury convicted her. Early on in this process, the United States went to her attorney. We have some credit on our side. We understood what the facts are. We suggested that cooperation would be there and that she cooperate against Mr. Canfield. She chose not to do that, Your Honor. Mr. Canfield chose another route. There is no one to blame here but Marion Hungerford herself . . . .

But if Hungerford was in any way responsible for her absurd sentence, it was that her Borderline Personality Disorder prevented her from admitting her guilt and thus avoiding the imposition of a sentence of 159 years in prison. Surely, one cannot reasonably fault Hungerford for suffering from overwhelming and severe mental illness. Hungerford, in layman's terms, may have explained her predicament as well as anyone possibly could when she proclaimed her innocence at sentencing and explained that:

> my crime is not robbing, my crime isn't hurting anybody, because I don't do that, and my crime is not using a weapon to get money. *My crime is being stupid*. That's my crime. And it looks like I'm going to be faced with a lot of years for being stupid.

It is difficult to believe that anyone familiar with all of the facts and circumstances relating to Marion Hungerford's com-

mission of the offenses of which she was convicted would believe that an appropriate sentence is 159 years in prison. In sum, the *result* in Hungerford's case, as well as our prior decisions applying the federal mandatory minimum sentencing laws, confirms why this court, Justice Kennedy, and many others have concluded that there is no wisdom or necessity in preserving the current mandatory minimum sentencing regime. The only question, then, is whether this and future Congresses will choose to listen and take appropriate action to return reason and rationality to our currently malfunctioning sentencing system.

Because I am required to do so, I concur in the judgment, but nothing more.

This attachment summarizes the testimony of Dr. William David Stratford, a forensic psychiatrist, who evaluated Hungerford. He testified that

> 1. Having previously completed between 6,000 and 10,000 prior psychiatric evaluations, interviewing Hungerford was "one of the most arduous, painful experiences in my life." During the evaluation Hungerford was "very fragmented," had "fixed patterns," and she "[w]ould at times look at the floor and be unresponsive for periods of ten minutes or so."

> 2. Hungerford suffers from "severe borderline personality disorder," described as "a line between psychosis and other diagnoses. It is a varying diagnosis. It is pervasive in stability of mood, actions. A person can be delusional. They can have fixed ideas that are incorrect. They can often be suicidal, moody, and have difficulty integrating the big picture."

> 3. The psychological impairment which affected Hungerford is "one of the most severe psychological

disorders. It's probably more severe than suffering from schizophrenia."

4.   Hungerford's "mental state significantly dimin-ishe[d] her capacity to appreciate criminality and conformed conduct."

5.   Hungerford's belief that she was not guilty is "a product of her mental illness."

6.   At sentencing, Hungerford did not have "a ratio-nal and factual understanding of what she's doing here" in the courtroom.

7.   Hungerford is a "follower" whose behavior is marked by "susceptibility to outside direction," and suggestivity.

8.   Hungerford does not presently constitute a dan-ger to society, based on her 52 years in which she was not been hostile to others, and could benefit from treatment.